No. 21-56150

# 𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals

## for the Ninth Circuit

——— ǀ ———

**Y.Y.G.M. SA, a Swiss corporation, DBA Brandy Melville**
*Plaintiff-Appellant & Cross-Appellee*

v.

**Redbubble, Inc.**
*Defendant-Appellee & Cross-Appellant*

——— ǀ ———

Appeal from the United States District Court
Central District of California
No. 2:19-cv-04618-RGK-JPR
Honorable R. Gary Klausner, District Judge, Presiding

## Opening Brief of Appellant/Cross-Appellee Y.Y.G.M. SA dba Brandy Melville

Keith J. Wesley
Ryan Q. Keech
Jason Y. Kelly
Ellis George Cipollone O'Brien
Annaguey LLP
2121 Avenue of the Stars, Ste. 2800
Los Angeles, CA 90067
E-mail: kwesley@egcfirm.com
Phone: 310-274-7100
Fax: 310-275-5967

Christopher Landau
Ellis George Cipollone O'Brien
Annaguey LLP
1155 F. Street NW, Ste. 750
Washington, DC 20004
E-mail: clandau@egcfirm.com
Phone: 202-249-6900
Fax: 202-249-6899

*Counsel for Appellant/Cross-Appellee*
March 28, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant

certifies that it has no parent corporation and that no publicly held

corporation owns 10% or more of any stock.


Date: March 28, 2022            */s/ Keith J. Wesley*
                                Keith J. Wesley
                                Ellis George Cipollone O'Brien
                                Annaguey LLP
                                2121 Avenue of the Stars, Ste. 2800
                                Los Angeles, CA 90067

                                *Counsel for Appellant/Cross-Appellee*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................iii

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION.......................................................... 4

STATEMENT OF THE ISSUES............................................................. 4

STATEMENT OF THE CASE AND THE FACTS ................................... 5

I.    Brandy Melville And Its Trademarks ............................................. 5

II.   Redbubble................................................................................. 6

III.  This Lawsuit ............................................................................. 8

IV.  Post-Trial Rulings ................................................................... 11

SUMMARY OF THE ARGUMENT ....................................................... 12

ARGUMENT ................................................................................... 14

I.    The District Court Erred As A Matter Of Law By Setting
     Aside The Jury's Verdict Of Contributory Counterfeiting
     Involving The Heart Mark. .......................................................... 14

    A.   Standard Of Review ............................................................. 14

    B.   Analysis.............................................................................. 15

II.   The District Court Abused Its Discretion By Denying A
     Permanent Injunction. ............................................................... 22

    A.   Standard Of Review ............................................................. 22

    B.   Analysis.............................................................................. 22

        1.   Pre-Litigation Delay Is Not Relevant To The
           Post-Verdict Irreparable Injury Analysis. ................... 23

i

# TABLE OF CONTENTS

**Page**

    2.    Even If Pre-Litigation Delay Were An Appropriate Factor To Consider Post-Verdict, The District Court Abused Its Discretion By Failing To Issue A Permanent Injunction. .............................. 30

III.   The District Court Abused Its Discretion By Denying Attorneys' Fees. ................................................. 33

    A.    Standard Of Review ................................................ 33

    B.    Analysis................................................................... 34

        1.    The District Court Used An Incorrect Measure Of "Success" To Determine Exceptionality. ...................... 34

        2.    The District Court Abused Its Discretion In Declining To Find This Case Exceptional And To Award Fees..................................................................... 38

IV.   The District Court Erred By Denying Prejudgment Interest. ...... 45

    A.    Standard Of Review ................................................ 45

    B.    Analysis................................................................... 45

CONCLUSION..................................................................... 51

CERTIFICATE OF COMPLIANCE ........................................ 53

ADDENDUM OF PERTINENT STATUTES (NINTH CIRCUIT RULE 28-2.7) ................................................................ 54

CERTIFICATE OF SERVICE ................................................ 75

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*4SEMO.com Inc. v. S. Ill. Storm Shelters, Inc.*,
  939 F.3d 905 (7th Cir. 2019) .................................................. 44

*A.D. v. California Highway Patrol*,
  712 F.3d 446 (9th Cir. 2013) .................................................. 21

*Am. Auto. Ass'n, Inc. v. Best Value Inn Oasis of Eden*,
  No. 12-cv-1303, 2012 WL 13012711 (C.D. Cal. July 10, 2012) .......... 42

*Am. Honda Motor Co., Inc. v. Two Wheel Corp.*,
  918 F.2d 1060 (2d Cir. 1990) ................................................ 46

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,
  522 F.3d 1200 (11th Cir. 2008) ............................................. 31

*Arc of Cal. v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) .................................... 23, 28, 29

*Arista Records, Inc. v. Beker Enters., Inc.*,
  298 F. Supp. 2d 1310 (S.D. Fla. 2003) ................................... 43

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,
  457 F.3d 1062 (9th Cir. 2006) .............................................. 41

*Big Bus Tours Ltd. v. Half Price Tour Tickets*, LLC,
  No. 12-cv-21579, 2012 WL 13014655 (S.D. Fla. Nov. 26, 2012) ........ 43

*Chevron U.S.A. Inc. v. Echazabal*,
  536 U.S. 73 (2002) .............................................................. 48

*Choice Hotels Int'l, Inc. v. Kumar & Birla, LLC*,
  No. 11-cv-5100, 2013 WL 12097438 (E.D. Wash. Jan. 14,
  2013) ............................................................................... 42

*Ctr. for Food Safety v. Schafer*,
No. 08-cv-484, 2010 WL 964017 (N.D. Cal. Mar. 16, 2019) ............... 23

*Curves Int'l, Inc. v. Nash*,
No. 11-cv-425, 2013 WL 3872832 (N.D.N.Y. July 25, 2013) .............. 42

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) ................................................................ 25

*Dunn & Fenley, LLC v. Allen*,
No. 02-cv-1750, 2007 WL 2973549 (D. Or. Oct. 9, 2007) .................... 40

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ............................................................................. 27

*Est. of Diaz v. City of Anaheim*,
840 F.3d 592 (9th Cir. 2016) ................................................................ 15

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
654 F.3d 989 (9th Cir. 2011) ................................................................ 27

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*,
886 F.2d 1545 (9th Cir. 1989) .............................................................. 46

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ................................................................ 23

*General Motors Corp. v. Devex Corp.*,
461 U.S. 648 (1983) ............................................................................. 48

*Gonzalez v. U.S. Immigr. & Customs Enf't*,
975 F.3d 788 (9th Cir. 2020) ................................................................ 22

*Gore, Inc. v. Glickman*,
137 F.3d 863 (5th Cir. 1998) ................................................................ 45

*Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*,
874 F.2d 431 (7th Cir. 1989) ................................................................ 46

*Gucci Am., Inc. v. Guerrero*,
No. 07-cv-7898, 2008 WL 11336190 (C.D. Cal. Nov. 4, 2008) ........... 42

iv

*H-D U.S.A., LLC v. SunFrog, LLC,*
  311 F. Supp. 3d 1000 (E.D. Wis. 2018) ................................................ 17

*Harlequin Enters. Ltd. v. Gulf & W. Corp.,*
  644 F.2d 946 (2d Cir. 1981) ................................................................. 25

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ................................................................ 35, 37, 38

*Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.,*
  219 F.3d 104 (2d Cir. 2000) ........................................................... 24, 25

*Jackson v. Axton,*
  25 F.3d 884 (9th Cir. 1994) .................................................................. 35

*Johnson v. Continental Airlines Corp.,*
  964 F.2d 1059 (10th Cir. 1992) ........................................................... 47

*Jurgens v. CBK, Ltd.,*
  80 F.3d 1566 (Fed. Cir. 1996) ............................................................. 39

*Kansas v. Colorado,*
  533 U.S. 1 (2001) ................................................................................. 45

*Kars 4 Kids Inc. v. America Can!,*
  8 F.4th 209 (3d Cir. 2021) ................................................................... 46

*Kleier Advertising, Inc. v. Premier Pontiac, Inc.,*
  921 F.2d 1036 (10th Cir. 1990) ........................................................... 49

*Koon v. United States,*
  518 U.S. 81 (1996) ......................................................................... 22, 34

*Kroll-O'Gara Co. v. First Defense Int'l, Inc.,*
  No. 99-cv-4899, 2000 WL 369721 (S.D.N.Y. Apr. 11, 2000) .............. 43

*L.A. Memorial Coliseum Comm'n v. N.F.L.,*
  634 F.2d 1197 (9th Cir. 1980) ............................................................. 26

*Levi Strauss & Co. v. Shilon,*
  121 F.3d 1309 (9th Cir. 1997) ............................................................. 20

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015) ...................................................... 17

*Love v. Associated Newspapers, Ltd.*,
   611 F.3d 601 (9th Cir. 2010)................................................................. 39

*Lydo Enters., Inc. v. City of Las Vegas*,
   745 F.2d 1211 (9th Cir. 1984)............................................................... 28

*Maljack Prods., Inc. v. GoodTimes Home Video Corp.*,
   81 F.3d 881 (9th Cir. 1996) .................................................................. 39

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ................................................................ 27

*Mary Helen Coal Corp. v. Hudson*,
   235 F.3d 207 (4th Cir. 2000) ................................................................ 49

*McLean v. Fleming*,
   96 U.S. 245 (1877) ............................................................................... 25

*Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*,
   788 F. Supp. 2d 71 (E.D.N.Y. 2011) .................................................... 28

*Miller v. Robertson*,
   266 U.S. 243 (1924) ............................................................................. 46

*Milwaukee v. Cement Div., Nat'l Gypsum Co.*,
   515 U.S. 189 (1995) ............................................................................. 45

*Moore v. CapitalCare, Inc.*,
   461 F.3d 1 (D.C. Cir. 2006) ................................................................. 48

*NLRB v. SW General, Inc.*,
   137 S. Ct. 929 (2017) ........................................................................... 48

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,
   762 F.2d 1374 (9th Cir. 1985)............................................................... 26

*Ohio State Univ. v. Redbubble, Inc.*,
   989 F.3d 435 (6th Cir. 2021)..................................................... 3, 8, 10

vi

*In re Oil Spill by The Amoco Cadiz*,
  954 F.2d 1279 (7th Cir. 1992) ............................................................ 45

*Parsons v. Ryan*,
  949 F.3d 443 (9th Cir. 2020).............................................................. 34

*Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*,
  692 F.2d 1272 (9th Cir. 1982).............................................................. 44

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*,
  324 U.S. 806 (1945) ............................................................................ 25

*Price v. Kramer*,
  200 F.3d 1237 (9th Cir. 2000).............................................................. 15

*Reed v. Lieurance*,
  863 F.3d 1196 (9th Cir. 2017)........................................................ 14, 15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ............................................................................ 15

*Rodgers v. United States*,
  332 U.S. 371 (1947) ............................................................................ 49

*Russello v. United States*,
  464 U.S. 16 (1983) .............................................................................. 48

*Smith v. Chanel, Inc.*,
  402 F.2d 562 (9th Cir. 1968).............................................................. 41

*Sossamon v. Lone Star State of Texas*,
  560 F.3d 316 (5th Cir. 2009).............................................................. 49

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
  839 F.3d 1179 (9th Cir. 2016)............................................ 33, 38, 39, 40

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011).............................................................. 44

*Utd. Phosporus, Ltd. v. Midland Fumigant, Inc.*,
  205 F.3d 1219 (10th Cir. 2000)........................................................... 46

*W. Va. v. United States*,
479 U.S. 305 (1987) .............................................................. 46, 47, 48

*Wildman v. Burlington N. R.R. Co.*,
825 F.2d 1392 (9th Cir. 1987) .......................................... 45

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ............................................................... 24

**Statutes**

15 U.S.C. § 1114 ................................................................... 9

15 U.S.C. § 1116(a) ..................................................... 22, 23, 27

15 U.S.C. § 1116(d)(B) ........................................................ 16

15 U.S.C. § 1117(a) ................................... 14, 34, 38, 45, 46, 47, 49, 50, 51

15 U.S.C. § 1117(b) ..................................................... 14, 47, 49, 50

15 U.S.C. § 1117(c) ............................................................ 41

15 U.S.C. § 1121 ................................................................... 4

15 U.S.C. § 1125(a) ............................................................. 9

15 U.S.C. § 1127 ............................................................ 16, 19

26 U.S.C. § 6621(a)(2) ....................................................... 50

28 U.S.C. § 1291 ................................................................. 4

28 U.S.C. § 1331 ................................................................. 4

**Rules**

Fed. R. App. P. 4(a)(1)(A) .................................................... 4

Fed. R. App. P. 32(a)(7)(C) .............................................. 53

Fed. R. App. P. 26.1 ............................................................ i

Fed. R. Civ. P. 28-2.6 ................................................................... 52

Fed. R. Civ. P. 50 ......................................................................... 15

Fed. R. Civ. P.  50(a) .................................................................... 11

Fed. R. Civ. P. 56 ......................................................................... 15

Fed. R. Civ. P. 65(a) ..................................................................... 26

## **Other Authorities**

5 McCarthy on Trademarks and Unfair Competition § 30:1 (5th
    ed. West 2022) .......................................................... 13, 24, 31

5 McCarthy on Trademarks and Unfair Competition § 30:2 (5th
    ed. West 2022) .................................................................. 31

11A Fed. Prac. & Proc. Civ., Purpose and Scope of Preliminary
    Injunctions, § 2947 (3d ed. Westlaw 2022) .......................................... 26

Ninth Circuit Model Civil Jury Instruction No. 5.3 ................................ 42

S. Rep. No. 1400, 93d Cong., 2d Sess., reprinted in 1974 U.S.
    Code Cong. & Ad. News 7132 ............................................................ 39

## INTRODUCTION

This appeal presents the question whether the Lanham Act provides a meaningful tool for businesses to protect their trademarks. A jury here returned a verdict that defendant Redbubble willfully counterfeited and infringed plaintiff Brandy Melville's trademarks. Through a series of post-trial rulings, however, the district court effectively stripped Brandy Melville of its victory. The court first held that the jury's verdict on one of the counterfeiting claims was unsupported by evidence and granted Redbubble judgment as a matter of a law on that claim. The court then denied Brandy Melville a permanent injunction on the ground that it had not sued promptly enough, thereby effectively authorizing Redbubble to continue willfully knocking off Brandy Melville's federally registered marks until Brandy Melville sues again. And finally the court effectively ensured that Brandy Melville would never sue again by denying attorneys' fees and prejudgment interest, thereby leaving Brandy Melville over a million dollars in the red even after successfully pursuing the case to jury verdicts of willful counterfeiting and infringement.

1

The district court thereby erred, and turned trademark law and remedies on their head. Indeed, this Court is unlikely to encounter many trademark cases as brazen as this. Redbubble is an online business that profits from enabling users to print images on a wide variety of products. Although Redbubble claims to provide a forum for "artists" to share and monetize their works, it has become infested by scofflaws who simply slap registered marks, like Brandy Melville's, on merchandise. In essence, thus, Redbubble is the virtual equivalent of that infamous stretch of New York's Canal Street where any designer handbag can be had for $50— that is, if a single company owned and marketed the street, solicited the vendors, facilitated the purchases, arranged for production of the counterfeit goods, packaged them with its own branding, and handled all payments and returns. Below are a few examples from the record of counterfeit goods peddled on Redbubble:



2



2-ER-250 (Tesla); 2-ER-254 (Coke); 2-ER-284 (USC); 2-ER-285 (Los Angeles Dodgers). Further examples can be viewed at 2-ER-108 (McDonalds), 2-ER-115 (Starbucks), 2-ER-222 (Calvin Klein), 2-ER-226 (Maserati), 2-ER-230 (Marvel), 2-ER-258 (Pepsi), 2-ER-262 (Star Wars), 2-ER-266 (Jurassic Park), 2-ER-270 (Chicago Cubs), 2-ER-274 (Pokémon)—and more. In short, if you are a brand with a significant footprint in the U.S., there is little question you have been or are being counterfeited on and by Redbubble. *See, e.g., Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435 (6th Cir. 2021) (college sports trademarks).

If victims of trademark infringement are effectively penalized for seeking to vindicate their rights under the Lanham Act, so that they lose even when they win, they will not bother to sue. That result would simply reward Redbubble, and other digital bazaars devoted to reproducing and

profiting off of federally registered marks, for their misconduct. The Lanham Act neither requires nor allows such a toothless approach. To the contrary, the Act gives federal courts all the tools they need to make successful trademark plaintiffs, like Brandy Melville, whole. The district court below erred in its post-trial rulings by refusing to use those tools, and this Court should reverse those rulings.

## STATEMENT OF JURISDICTION

Y.Y.G.M. SA, a Swiss corporation, d/b/a Brandy Melville properly invoked the jurisdiction of the district court in this Lanham Act case under 15 U.S.C. § 1121 and 28 U.S.C. § 1331. 1-ER-22. Brandy Melville is subject to a final judgment of the district court, entered July 27, 2021, and a post-judgment order entered on October 5, 2021. 1-ER-7, 16. It timely filed a notice of appeal on October 19, 2021 and properly invoked this Court's jurisdiction under 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4(a)(1)(A). 2-ER-326, 3-ER-356.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred as a matter of law by setting aside the jury's verdict of contributory counterfeiting involving the Heart mark.

II.     Whether the district court abused its discretion by denying a permanent injunction.

III.    Whether the district court abused its discretion by denying attorneys' fees.

IV.    Whether the district court erred by denying prejudgment interest.

## STATEMENT OF THE CASE AND THE FACTS

### I.   Brandy Melville And Its Trademarks

Plaintiff-Appellant/Cross-Appellee Brandy Melville is a popular fashion and lifestyle business that produces branded clothing, jewelry, and decorative items. 1-ER-22. Two of its valuable registered trademarks are: (1) the Brandy Melville (also called the Heart) mark, USPTO Registration No. 5,238,856



and (2) the LA Lightning mark, USPTO Registration No. 5,748,883



1-ER-22, 23; *see also* 2-ER-127 (federal registration of Heart mark); 2-ER-130 (federal registration of LA Lightning mark). The Heart mark

is registered for use on a wide variety of items, including clothing, furniture, stickers, linens, and decorative objects. 2-ER-127. The LA Lightning mark is registered for use on clothing. 2-ER-130. In addition, Brandy Melville owns a variety of unregistered marks. 1-ER-4.

## II. Redbubble

Defendant-Appellee/Cross-Appellant Redbubble is the owner and operator of www.redbubble.com. 1-ER-23. Users of the website (Redbubble dubs them "artists") upload designs to Redbubble's site, and Redbubble arranges to have those designs printed on various items like clothing, stickers, and other decorative items on demand (*i.e.*, once a customer orders a particular good with a particular artist's design). *Id.* Redbubble actively solicits these "artists" to submit designs, a significant percentage of which are infringing. 2-ER-150; 2-ER-213 (lns. 19-25), 214 (lns. 1-19); *see* 2-ER-321 (Redbubble is often sued for intellectual property infringement); *see also supra* p.2-3 & accompanying examples.

Redbubble's on-demand production process works like this: After a consumer makes a purchase on Redbubble's website, the company's software automatically selects a manufacturer—called a "fulfiller"—that manufactures the product. 1-ER-23. Redbubble's software selects a

fulfiller based on the product type, as well as the fulfiller's capabilities and geographic proximity to the customer. *Id.* This process is completely opaque to both the artist and the consumer, who have no connection to the fulfiller. *Id.* While Redbubble does not take possession of individual items before they pass to the consumer, it does exercise control over the manufacturing process through contracts and site visits. 2-ER-301-02.

In addition to arranging for the manufacture of goods, Redbubble automatically processes the customer's payment and handles all returns, refunds, and vouchers for products purchased on its site. 1-ER-23. Redbubble collects and remits the sales tax, is the principal in the sale, and acts as the fulfiller's principal. 1-ER-25-26. Goods are shipped from the fulfiller to the customer in Redbubble-branded packaging. 1-ER-23.

In sum, as a sister circuit held:

> [I]t appears that Redbubble brings trademark-offending products into being by working with third-party sellers to create new Redbubble products, not to sell the artists' products. So it's more than just a passive facilitator. And Redbubble classifies its goods as 'Redbubble products' and makes clothes identifiable as 'Redbubble garments.' . . . That differs from Amazon's marketplace and makes more 'use' of the trademark than non-liable facilitators in cases from other circuits.

7

*Ohio State*, 989 F.3d at 448.

## III. This Lawsuit

In May 2018, Brandy Melville advised Redbubble that it was selling goods with counterfeit Brandy Melville marks and designs otherwise confusingly similar to the LA Lightning and Heart marks. 1-ER-23-24. Redbubble took down the specific items Brandy Melville's letter identified and then put the onus on Brandy Melville to monitor Redbubble's site and alert it of any infringing goods. *Id.*

This was no small matter for Brandy Melville due to the extent of the infringement and counterfeiting on Redbubble's site. A search for "Brandy Melville" on the Redbubble site would effectively transport customers to a virtual Brandy Melville store owned and operated by Redbubble. The Redbubble website would list as many as 9,000 designs that a customer might otherwise encounter at the authentic Brandy Melville store or website, except that Redbubble's version of a Brandy Melville store was not authorized and the products on which the designs would be printed were neither authorized nor comparable in quality to authentic Brandy Melville goods. 2-ER-40-41, 45, 52-85, 133-46.

8

After Redbubble failed to improve the trademark policing on its site over the ensuing year, Brandy Melville filed this lawsuit in May 2019. 3-ER-333. The complaint asserted five causes of action: (1) trademark infringement and counterfeiting under 15 U.S.C. § 1114; (2) false designation of origin under 15 U.S.C. § 1125(a); (3) common law unfair competition; (4) contributory trademark infringement and counterfeiting; and (5) vicarious trademark infringement and counterfeiting. 1-ER-22. These were different theories applied to three distinct acts: (1) the sale of merchandise bearing a counterfeit mark or design otherwise infringing the Heart mark; (2) the sale of merchandise bearing a counterfeit mark or design otherwise infringing the LA Lightning mark; and (3) infringement of Brandy Melville's unregistered trademarks. 1-ER-22-24; 2-ER-123-25.

After the close of discovery, Redbubble moved for summary judgment on all claims, and Brandy Melville moved for summary judgment as to liability. 1-ER-22. The district court (Klausner, J., C.D. Cal.) denied Brandy Melville's motion but granted Redbubble's as to all theories of liability except contributory counterfeiting and trademark

infringement.[1]  *Id.*  The parties then proceeded to a three-day jury trial on those contributory claims.

After hearing both sides, the jury delivered a verdict almost entirely in Brandy Melville's favor.  2-ER-122-25.  It determined that Redbubble had engaged in contributory counterfeiting of the Heart mark and that this counterfeiting was willful.  2-ER-123.  It determined that Redbubble had engaged in contributory counterfeiting of the LA Lightning mark and that this counterfeiting was willful.  2-ER-123-24.  And it determined that Redbubble had engaged in contributory trademark infringement of the Heart mark, the LA Lightning mark, and the unregistered marks.  2-ER-124-25.  The only claim on which Brandy Melville did not prevail was related to its Flag trademark.  2-ER-124.  (Inclusion of the Flag claim

---

[1] Brandy Melville respectfully submits that the district court erred by granting summary judgment on direct infringement, as the Sixth Circuit has concluded in an analogous case.  *See Ohio State*, 989 F.3d at 448 (reversing summary judgment in favor of Redbubble, and holding that a reasonable juror could find Redbubble to be a direct infringer).  Nevertheless, in an effort to avoid the time, expense, and burden of a re-trial, Brandy Melville does not challenge that ruling, and instead seeks to be made whole through reinstatement of the entire jury verdict on contributory counterfeiting liability and the ancillary relief at issue here.

on the verdict form was an error, given that Brandy Melville presented no evidence concerning that claim at trial.)

By way of remedy, the jury awarded $300,000 in statutory damages for contributory counterfeiting of the Heart mark, $200,000 in statutory damages for contributory counterfeiting of the LA Lightning mark, and $20,000 in actual damages for contributory infringement of the Heart, LA Lightning, and unregistered marks.  2-ER-123-25.

## IV.   Post-Trial Rulings

Prior to submission of the case to the jury, Redbubble moved for judgment as a matter of law on all of Brandy Melville's claims under Federal Rule of Civil Procedure 50(a).  1-ER-18.  The district court took the matter under advisement and, after the verdict, granted Redbubble's motion as to the claim of contributory counterfeiting of the Heart mark. 1-ER-20-21.  The court denied the motion in all other respects.  1-ER-21. Or, more precisely, the court denied the motion as to some arguments and dismissed it as to others; Redbubble waived several of its arguments by failing to comply with the district court's standing order.  *Id.* at n.1.

Brandy Melville then moved for a permanent injunction, attorneys' fees, and prejudgment interest.  1-ER-7.  The district court denied all

three forms of relief in their entirety. 1-ER-8. This timely appeal and a cross-appeal by Redbubble follow. 3-ER-356.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court on four grounds.

***First***, this Court should reverse the district court's grant of judgment as a matter of law as to the contributory counterfeiting verdict involving the Heart trademark. The district court based that ruling on the erroneous view that a counterfeiting claim requires evidence of the sale of an identical ***product***. Under the Lanham Act's plain text, a counterfeiting claim requires evidence of the use of an identical ***mark*** in connection with the sale of a product for which the mark is registered. The record here contains ample evidence that Redbubble promoted and sold goods branded with Brandy Melville's Heart mark, and that the mark is registered for those categories of goods. That is all that is necessary to establish a counterfeiting claim, and the district court's contrary conclusion is wrong as a matter of law.

***Second***, the district court abused its discretion by denying Brandy Melville a permanent injunction against further counterfeiting and infringement. The court's sole basis for denying injunctive relief was the

passage of almost a year between the time Brandy Melville sent Redbubble a cease-and-desist letter and the time Brandy Melville filed this lawsuit. But even if this standard pre-filing delay could be characterized as laches—which it cannot—it is axiomatic that laches is not a defense to permanent injunctive relief in a trademark case. Trademark law exists to protect the public from confusion. A counterfeiter or trademark infringer acquires no vested right to continue its unlawful activity in perpetuity just because it is not sued soon enough. That is why, as the leading treatise explains, "[a] permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment." 5 McCarthy on Trademarks and Unfair Competition § 30:1 (5th ed. West 2022).

*Third*, the district court abused its discretion by denying Brandy Melville attorneys' fees despite the jury's verdict of willful counterfeiting and infringement. The district court erred by judging success for purposes of attorneys' fees by the proportion of *legal theories* that ultimately succeed, rather than the proportion of *claims* that succeed.

*Fourth*, the district court erred by denying Brandy Melville prejudgment interest. Prejudgment interest is necessary to make a

plaintiff whole, and is thus an ordinary part of the remedy for the violation of a federal statute. The district court below, however, concluded that Congress *sub silentio* departed from this background rule by failing to include prejudgment interest among the specific remedies available under Section 1117(a) of the Lanham Act, but including it as a as a remedy under Section 1117(b) of that statute. Section 1117(b) addresses prejudgment interest to explain how it should apply in the unique context of treble damages, a clarification that is not necessary in the standard compensatory-damages context of Section 1117(a). The district court placed too much weight on the *expressio unius* canon by using it to override the background presumption that prejudgment interest is available as an element of compensatory damages for successful federal claims.

## ARGUMENT

**I.    The District Court Erred As A Matter Of Law By Setting Aside The Jury's Verdict Of Contributory Counterfeiting Involving The Heart Mark.**

### A.    Standard Of Review

This Court reviews *de novo* a district court's grant of judgment as a matter of law.  *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).

"[J]udgment as a matter of law is appropriate when the evidence permits only one conclusion." *Price v. Kramer*, 200 F.3d 1237, 1244 (9th Cir. 2000).

The standard for judgment as a matter of law under Federal Rule of Civil Procedure 50 "'mirrors' the summary judgment standard" under Rule 56. *Reed*, 863 F.3d at 1204. "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 604 (9th Cir. 2016) (internal quotation marks omitted). The reviewing court "may not make credibility determinations or weigh the evidence." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

## B. Analysis

The district court erred as a threshold matter by granting Redbubble's motion for judgment as a matter of law to nullify the jury's verdict of willful contributory counterfeiting with respect to Brandy Melville's Heart mark. According to the district court, Brandy Melville "failed to present evidence of ***products*** that bore a spurious Brandy Melville Heart mark and were offered for sale on Redbubble.com that

were remotely similar to **products** that [Brandy Melville] offered for sale, let alone 'stitch-for-stitch copies' of [Brandy Melville's] **products**." 1-ER-20 (emphasis added). For that reason, the court declared, Brandy Melville "failed to establish that Redbubble is liable for contributory counterfeiting of the Brandy Melville Heart Mark." *Id.*

The district court erred by holding that a counterfeiting claim focuses on comparison of two **products**, as opposed to two **marks**. The statute defines a "counterfeit" as "a spurious **mark** which is identical with, or substantially indistinguishable from, a registered **mark**." 15 U.S.C. § 1127 (emphasis added). The statute further defines a "counterfeit mark" as "a counterfeit of a **mark** that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered," with the exception of licensed marks. 15 U.S.C. § 1116(d)(B) (emphasis added). Note that the statute nowhere refers to counterfeit "products," but only to counterfeit "marks." If a defendant uses an identical **mark** on a "good" of the type for which the mark is registered, then the defendant has engaged in counterfeiting even if the

good is not identical to a specific good sold by the plaintiff. *See*, *e.g.*, *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1027 (E.D. Wis. 2018) ("[T]he counterfeiting inquiry is not focused primarily on the quality of the goods bearing the subject marks. . . . The more pertinent question is whether the marks, not the goods, are substantially identical."). Indeed, counterfeit goods are often of notably inferior quality to the goods whose spurious marks they bear, and those differences between the goods (as opposed to the marks) provides the counterfeiter no defense. *See id.* at 1027-28; *see also Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d 485, 499 (S.D.N.Y. 2015).

Here, there can be no dispute that Redbubble used Brandy Melville's registered Heart mark. This is the registered mark:

United States Patent and Trademark Office

Brandy ♥ Melville

2-ER-127. As the registration explains, "The mark consists of the wording 'BRANDY MELVILLE' in black with a pink heart between 'BRANDY' and 'MELVILLE.'" *Id.* The mark does not specify a particular font for the words. The mark is registered for use in connection with a

wide range of products, including "Dresses; berets; footwear; stockings; socks; shirts; **_hats_**; coats; waist belts; tights; bustiers; jackets; blousons; skirts; boxer shorts; pants; footwear; sandals; shawls; underpants; sashes for wear; beachwear; beach footwear; **_tee-shirts_**; underpants," and "Adhesive tapes for stationery or household purposes; drawings and stencils; **_stickers_**; sketch books; pamphlets in the field of fashion; calendars; pens; leaflets about fashion." *Id.* (emphasis added).

Here are three items from the record offered for sale on Redbubble:





2-ER-136, 142, 144 (introduced at trial as part of Exhibit 183). The jury could reasonably have concluded that all of these images involved counterfeit *marks* within the meaning of the statute, even if Brandy Melville did not sell identical *products*. These images show "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark," 15 U.S.C. § 1127, *i.e.*, the Heart mark. Brandy Melville's Executive Vice President and Chief Financial Officer for the United States, Salvatore Rianna, testified at trial that he saw these goods and others with the counterfeit Heart mark for sale on Redbubble. 2-ER-209-11. In particular, he said that he saw Brandy Melville's Heart mark on "T-shirts" and "hats" offered on Redbubble, both of which are expressly covered by the Heart registration. 2-ER-210. (An *offer* to sell

a counterfeit good violates the Lanham Act no less than an ***actual*** sale of a counterfeit good.  *See, e.g.*, *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312-13 (9th Cir. 1997).)  Indeed, the record includes a Redbubble spreadsheet of 67 items sold substantially similar to this:



| work_id | image | work_title | purchase_order_id | order_created_at_pst | order_payment_date_pst | purchase_order_line_item_id | product_type | buyer_country |
|---|---|---|---|---|---|---|---|---|
| 21164191 | | Brandy Melville | 19992023 | 2018-05-12 00:20:08-07 | 2018-05-12 00:20:13-07 | 81223825 | StickerProduct | UNITED STATES |

2-ER-171-177.  The "image" column in almost every instance is filled with the Heart mark, and most of the products are apparently stickers.  *See id.*  As noted above, "stickers" are expressly listed among the products for which the Heart mark is registered.  2-ER-127.

Indeed, the district court acknowledged in its summary judgment ruling that "[t]he [Heart] mark is registered for use on a wide range of products, including . . . stickers" and that "[t]he infringing items offered through Redbubble's website have included . . . stickers, wall decorations, and other items bearing the [Heart] mark."  1-ER-23-24.  What the district court apparently missed in granting Redbubble judgment as a matter of law on this claim is that these points alone resolved the issue;

instead, as noted above, the court appeared to believe that a counterfeiting claim requires the plaintiff to identify identical ***products***.

Given the record in this case, it is not surprising that the jury ruled in Brandy Melville's favor on the contributory counterfeiting claim involving the Heart mark, and concluded that the counterfeiting was willful. *See* 2-ER-123. Nor is it surprising that the jury awarded $100,000 more in statutory damages for the contributory counterfeiting claim involving the Heart mark than on the contributory counterfeiting claim involving the LA Lightning mark (which the district court upheld). *See* 2-ER-123-24 (awarding $300,000 in damages for the Heart mark and $200,000 in damages for the LA Lightning mark). Because there was more than sufficient evidence to support the jury's verdict on the contributory counterfeiting claim involving the Heart mark, this Court should reverse the grant of judgment as a matter of law on that claim. *See*, *e.g.*, *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (giving "significant deference to the jury's verdict" when reviewing motion for judgment as a matter of law following jury trial).

## II. The District Court Abused Its Discretion By Denying A Permanent Injunction.

### A. Standard Of Review

While the Court reviews a district court's decision whether to grant a permanent injunction for abuse of discretion, "the rulings of law relied upon by the district court in awarding injunctive relief" are reviewed "de novo." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 802 (9th Cir. 2020). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

### B. Analysis

The district court erred by denying Brandy Melville's request for a post-verdict permanent injunction under 15 U.S.C. § 1116(a). As noted above, the jury here returned a verdict that Redbubble engaged in **willful** counterfeiting and infringement. *See* 2-ER-123-24. Nonetheless, the court declined to enjoin Redbubble from continuing to engage in the unlawful conduct. According to the court, "Redbubble asserts that it has rebutted the presumption [of irreparable injury] and that Brandy Melville has failed to show irreparable harm because Brandy Melville's own delay in vindicating its rights demonstrates a lack of irreparable harm. The Court agrees." 1-ER-9. The delay to which Redbubble and

the district court refer is just over a year, from May 15, 2018, when Brandy Melville sent Redbubble a cease-and-desist letter, and May 28, 2019, when Brandy Melville filed this lawsuit. 1-ER-10. The upshot is that the district court left Redbubble free to continue willfully violating Brandy Melville's federal trademark rights unless and until Brandy Melville sues again. The district court thereby misapplied the law and abused its discretion.

### 1. Pre-Litigation Delay Is Not Relevant To The Post-Verdict Irreparable Injury Analysis.

If there were any doubt that an adjudicated trademark violation generally causes irreparable injury, Congress removed it by statute: "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction . . . ." 15 U.S.C. § 1116(a). In agreeing with Redbubble that Brandy Melville's pre-litigation delay in filing this lawsuit rebutted this presumption, the district court relied on three cases involving a *preliminary* injunction. *See* 1-ER-9-10 (citing *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015); *Arc of Cal. v. Douglas,* 757 F.3d 975, 990 (9th Cir. 2014); and *Ctr.*

*for Food Safety v. Schafer*, No. 08-cv-484, 2010 WL 964017, at \*4 (N.D. Cal. Mar. 16, 2010)).

The district court thereby glossed over the fundamental distinction between preliminary and permanent injunctive relief. A preliminary injunction is extraordinary; it grants a litigant relief ***before*** it has proved its case. *See, e.g.*, *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). A permanent injunction, in sharp contrast, is a standard remedy when a plaintiff successfully takes a trademark case to judgment; it recognizes that money damages are generally not an adequate remedy at law where consumer confusion is at issue. *See*, *e.g.*, 5 McCarthy on Trademarks and Unfair Competition § 30:1 (5th ed. West 2022).

Counsel has been unable to locate a single case, in any federal jurisdiction, where pre-litigation delay alone barred a ***permanent*** injunction. Quite the opposite in fact. Even pre-litigation delay amounting to laches, *i.e.*, extraordinary delay—which Redbubble did not even ***attempt*** to establish here—does not defeat permanent injunctive relief in this context. *See*, *e.g.*, *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). That point makes sense: because trademark law protects the public from confusion, any delay by the

24

plaintiff in suing is irrelevant to the need for permanent injunctive relief to prevent such future confusion. Put differently, a trademark defendant does not acquire any entitlement to continue knocking off products in perpetuity just because the plaintiff did not sue promptly enough. *See, e.g.*, *McLean v. Fleming*, 96 U.S. 245, 251 (1877) (holding that twenty-year delay in suing barred plaintiff from pursuing monetary relief based on past infringement but did not bar him from pursuing injunctive relief to prevent future infringement). That is particularly true where, as here, willful violations of the law are at issue: it is axiomatic that "he who comes into equity must come with clean hands," *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945), and a willful infringer cannot invoke the equitable doctrine of laches (much less rely on a delay that does not even rise to the level of laches), *see Hermès*, 219 F.3d at 107; *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir. 1981); *cf. Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 956-57 (9th Cir. 2001) (recognizing that this principle is also Ninth Circuit law).

"Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary-injunction

application, the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." 11A Fed. Prac. & Proc. Civ., Purpose and Scope of Preliminary Injunctions, § 2947 (3d ed. Westlaw 2022); *see Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("[T]he basic function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.") (quoting *L.A. Memorial Coliseum Comm'n v. N.F.L.*, 634 F.2d 1197, 1200 (9th Cir. 1980)). This concern for the status quo and the defendant's rights do not, however, inflect the analysis for permanent injunctions; once there has been a judicial determination in favor of a plaintiff, the status quo has changed by definition—what was before only an assertion is now a judicially established right, and one the defendant is violating.

A plaintiff's delay in seeking preliminary relief certainly undercuts any argument that it is facing harm so irreparable that the defendant should have its freedom of action constrained prior to any determination on the merits. But after the entry of judgment in the plaintiff's favor, the defendant loses any legitimate interest in the status quo or fear of unjust

restraint.  Pre-suit delay is not relevant to permanent injunctions under the Lanham Act.

This approach is not only consistent with the fundamental distinction between preliminary and permanent injunctions but substantive trademark law.  In contrast to the patent and copyright contexts, where the mere fact of a violation does not lead to a presumption of irreparable harm, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 990 (9th Cir. 2011), that traditional presumption in the trademark context, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009), has now been codified by Congress, Trademark Modernization Act of 2020, Pub.L. 116-260, Div. Q, Title II, § 226(a), Dec. 27, 2020, 134 Stat. 2208 (codified at 15 U.S.C. § 1116(a)), and is free from doubt.  This difference among intellectual property rights is sound.  The reputational rights at the core of trademark protection are more ineffable and far less susceptible to quantification, than royalties for a patent or song, and trademark law protects consumers as well as the mark holders.  The law reflects this in its *ipso facto* presumption of irreparable injury.

So, trademark law, compared to other intellectual property law, favors a finding of irreparable injury. The general law of injunctions disfavors denials based on delay. *Douglas*, 757 F.3d at 990 (noting courts are "'loath to withhold'" even preliminary injunctive relief "'solely'" on the ground of delay) (quoting *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)). The combination of these tendencies counsels keeping the current distinction between the role delay plays in preliminary versus permanent injunctions.

Collapsing the distinction would also suggest that the failure to move for a preliminary injunction should foreclose permanent injunctive relief. And if a situation is really all that irreparable, how can a failure to move for a temporary restraining order be justified by this logic? This burdensome and unreasonable approach is not now, and should not become, the law. *Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*, 788 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2011) ("[T]he plaintiff's decision not to seek preliminary injunctive relief does not indicate a lack of irreparable harm."). The law does not compel a party to seek extraordinary relief to avoid forfeiting a claim of irreparable injury.

Maintaining the existing distinction between preliminary and permanent injunctions makes further sense as a matter of policy and fairness. If a trademark owner must decide between filing suit immediately and **forever** losing the right to injunctive relief, as opposed to merely forfeiting preliminary relief, the rational owner will always file suit immediately. Any incentive to discuss an extrajudicial resolution, to provide the infringer an opportunity to cure, or simply to wait and see whether the problem goes away on its own would risk permanent loss of one of the most important rights attending a trademark: the exclusive right to control it. Preliminary injunction motions—along with their substantial cost and burden on parties and the courts—will become the norm, rather than the exception.

Delay in the trademark context, as in others where circumstances can worsen over time, is also "not particularly probative." *Douglas*, 757 F.3d at 990. The reputational damage from an upstart website might be tolerable at first but become intolerable if the website grows. What, as in this case, where Redbubble made false promise after false promise to begin policing its site, is a credible reason to delay suit one day might become less credible as such promises are repeatedly broken. 2-ER-40-

41, 45, 52-85 (showing that Redbubble continued to infringe Brandy Melville's marks even post-***judgment***); *see also* 2-ER-87-120. Intellectual property portfolios change in value, and the degree of reputational damage a particular kind of infringement causes can vary with the times.  It is unfair to bar trademark owners from one of the Lanham Act's most valuable remedies because they believed a defendant would "do the right thing" and took a wait-and-see attitude rather than running to the courthouse door at the first inkling of infringement.

> ### 2. Even If Pre-Litigation Delay Were An Appropriate Factor To Consider Post-Verdict, The District Court Abused Its Discretion By Failing To Issue A Permanent Injunction.

It was an abuse of discretion for the district court to focus solely on Brandy Melville's alleged delay—or what others reasonably might call prudence—in bringing suit and to deny the customary remedy in a trademark case on that basis alone.  It was all the more an abuse of discretion because Brandy Melville actually adduced unrebutted evidence of irreparable injury at trial.

It is hard to put the rule any better than the McCarthy treatise:

> A permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment.

Consider the alternative. If a court were to permit the infringer to continue its infringing activities, the result would be a judicially imposed compulsory license given to an infringer. This would permit the likelihood of confusion to continue and deprive the consuming public of a truthful marketplace. Once it has been proven that confusion is likely, this means that customers will be likely to mistakenly attribute to plaintiff defects or negative impressions they have of the infringer's goods or services. That means that the plaintiff's reputation (and the value of the trademark that symbolizes that good will) is at risk because it is in the hands of a stranger who has violated trademark law. Therefore, monetary relief in the future for injuries incurred as time goes by cannot be deemed an "adequate" remedy: the continuing injury to plaintiff's good will and reputation is "irreparable."

5 McCarthy on Trademarks and Unfair Competition § 30:1 (5th ed. West 2022). "[In] ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008). Thus the rule is that "[w]here trademark infringement is proven, any doubts as to the adequacy of the relief are usually resolved against the infringer." 5 McCarthy on Trademarks and Unfair Competition § 30:2 (5th ed. West 2022) (footnote omitted).

The district court nowhere explains the reasoning behind what appears to be its premise: the occurrence of some irreparable injury while a party decides whether to bring suit means that a plaintiff cannot face

further risk of irreparable injury by an infringer's continuing misconduct. This theory is misplaced and ignores experience. While a brand may eventually become so damaged by a lengthy delay in bringing suit that further damage is too trivial to merit an injunction, neither did Redbubble produce nor did the district court rely on evidence of that kind of extreme circumstance. Indeed, if the brand were that damaged, there would be little economic motivation to continue infringing it. Yet we know that Redbubble continued, even post-verdict, to facilitate the counterfeiting and infringement of Brandy Melville's intellectual property. 2-ER-40-41, 45, 52-85. There must still be some reputation available for Redbubble to tarnish if it can still make money from ripping off Brandy Melville's marks.

The only actual evidence of irreparable injury in the record, as opposed to the district court's abstract hypothesis, came from Madison Elkins, a Brandy Melville employee. She testified that, in her experience, the sale of Brandy Melville designs through Redbubble's website harms the brand. 1-ER-10. No one rebutted her testimony, and the district court did not find it lacked credibility. Instead, the district court wrote: "While this testimony provides *some* evidence of harm, the Court finds

32

that this alone does not establish that Brandy Melville suffered irreparable harm by a preponderance of the evidence." *Id.* But why? The district court does not say. If a brand employee testifying under oath that a particular kind of trademark infringement harms the brand is not sufficient, what would be? The requirement is for irreparable injury simpliciter, not gigantic irreparable injury or catastrophic irreparable injury or extraordinary irreparable injury.

Redbubble is a duly adjudged willful contributory counterfeiter and infringer. Any doubts about whether Brandy Melville came forward with merely *some* or in fact *enough* evidence of irreparable injury should have been resolved in Brandy Melville's favor. The district court's refusal to provide Brandy Melville with the customary remedy in a case with multiple jury findings of *willful* counterfeiting, and with evidence that such is still occurring, was an abuse of discretion.

## III. The District Court Abused Its Discretion By Denying Attorneys' Fees.

### A. Standard Of Review

This Court reviews a "district court's decision on fees awarded under the Lanham Act [] for abuse of discretion," including whether the case qualifies as "exceptional" in the first instance. *SunEarth, Inc. v. Sun*

*Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1180-81 (9th Cir. 2016) (*per curiam*) (*en banc*). But "any elements of legal analysis and statutory interpretation underlying the district court's attorneys' fees decision are reviewed de novo," *Parsons v. Ryan*, 949 F.3d 443, 463 (9th Cir. 2020) (internal quotation marks omitted), and "[a] district court by definition abuses its discretion when it makes an error of law," *Koon*, 518 U.S. at 100.

### B.   Analysis

#### 1.   The District Court Used An Incorrect Measure Of "Success" To Determine Exceptionality.

As the district court noted, the parties agreed that degree of success is one factor to consider to determine whether a trademark case is exceptional and therefore merits a fee award under 15 U.S.C. § 1117(a). 1-ER-11-12. Where the parties parted ways is how to measure "success."

The district court judged success by tallying up the results Brandy Melville obtained on each of its ***theories*** of liability. 1-ER-12-13. Thus, the fact Brandy Melville originally asserted a vicarious liability theory but lost that issue at summary judgment means it did not obtain success. So too, at least from the district court's perspective, for Brandy Melville's

direct infringement, false designation of origin, and unfair competition claims.

But the inquiry into a party's degree of success for purposes of judging exceptionality, introduced into this Court's copyright (and so trademark) jurisprudence by *Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir. 1994), was through quotation of *Hensley v. Eckerhart*, 461 U.S. 424 (1983). And *Hensley* explicitly commanded courts to treat success on one legal theory but not others as a complete success when all theories were based on the same ***facts***. This is a claim-by-claim approach rather than a theory-by-theory approach.

Under *Hensley*, only when "a plaintiff may present in one lawsuit distinctly different claims for relief ***that are based on different facts*** and legal theories" does the failure on one set of operative facts diminish the degree of success. 461 U.S. at 434 (emphasis added). When there is "a common core of facts or . . . related legal theories . . . [s]uch a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff . . . ." *Id*. at 435.

To a trademark plaintiff interested in the bottom line, it does not matter that the defendant turned out not to be (at least according to the district court) a *direct* infringer and counterfeiter and is instead "merely" a *contributory* infringer and counterfeiter; Brandy Melville still succeeded in proving Redbubble an infringer and counterfeiter. Succeeding on all three theories would not enhance Brandy Melville's recovery—indeed, the prohibition against double recovery would prevent it receiving more money. That is why, for example, Brandy Melville has not appealed the district court's dismissal of its *direct* infringement claim; even success on that claim would not change the bottom line and thus Brandy Melville need not burden this Court by challenging that decision. *See supra* n.1. If failure on theories of liability, as opposed to claims, were to affect entitlement to attorneys' fees, however, this Court should expect to see an explosion of appeals from determinations regarding legal theories that do not matter in the real world except insofar as fees are involved.

That result would make no sense. Legal theories are the inside baseball that govern bottom line outcomes. Lawyers may well and truly care whether this theory or that succeeded, but what a client wants to

know is whether there will be a remedy for a wrong. Brandy Melville obtained compensation for every wrong it alleged, save those arising out of its abandoned claim based on the Flag mark. It obtained difficult-to-achieve findings of the highest standard of culpability, willfulness, that unlocked yet more remedies. By any standard Brandy Melville was successful.

The district court's response to the above was to observe that *Hensley* was concerned about degree of success for determining the **amount** of fees, not whether fees were justified at all. That manages to be true and yet unilluminating. *Hensley* is not directly on point—no case is, so far as the parties and the district court could determine—and therefore relevant only as an analogy. But the same logic that motivated *Hensley*—the notion that it is unproductive, if even possible, for district courts to attempt to parse out how the sausage was made—applies to the threshold inquiry as well. Brandy Melville is not a professor of intellectual property law. It is a business that had two of its federally registered marks counterfeited and infringed and a host of unregistered marks infringed. It received an award of money in compensation for those wrongs. That is how a client sees the world, and that is what

*Hensley* instructs courts to value.[2] Judged by the correct claim-by-claim standard of success rather than a theory-by-theory standard, Brandy Melville obtained a high degree of success.

>    **2.     The District Court Abused Its Discretion In Declining To Find This Case Exceptional And To Award Fees.**

In order to receive an award of attorneys' fees, Brandy Melville was required to show that this case was "exceptional." 15 U.S.C. § 1117(a). "[D]istrict courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case was exceptional." *SunEarth*, 839 F.3d at 1181 (*per curiam*) (*en banc*). The non-exclusive factors district courts should consider are: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and

_____

[2] The district court's approach also would create a dangerous precedent of discouraging plaintiffs from pleading and pursuing multiple—and sometimes competing or inconsistent—theories of liability in a single case. A plaintiff in a misrepresentation claim may, for example, be compelled to decide whether to pursue a fraud or negligent misrepresentation claim before filing a complaint or having the opportunity to pursue any discovery.

deterrence." *Id.* This Court has added "the degree of success obtained on the claim" to the list. *See, e.g., Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 (9th Cir. 1996).

While a showing of willfulness is no longer ***required*** to justify a fee award after *SunEarth*, "[a] trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 615 (9th Cir. 2010). "Upon a finding of willful infringement, a trial court should provide reasons for ***not*** increasing a damages award or for not finding a case exceptional for the purpose of awarding attorneys fees." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996) (emphasis added). As Congress remarked when adding a fee-shifting provision to the Lanham Act: "Effective enforcement of trademark rights is left to the trademark owners and they should, in the interest of preventing purchaser confusion, be encouraged to enforce trademark rights. ***It would be unconscionable not to provide a complete remedy including attorney fees for acts which courts have characterized as malicious, fraudulent, deliberate, and willful***." S. Rep. No. 1400, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 7132,

7136 (emphasis added). While a showing of willfulness may not be *necessary* to make a case "exceptional," it is usually *sufficient*: thus, even before *SunEarth*, a district court within this Circuit could write: "The parties have cited, and I have found, no reported decisions in which a plaintiff that established willful infringement was not awarded attorney fees." *Dunn & Fenley, LLC v. Allen*, No. 02-cv-1750, 2007 WL 2973549, at *3 n.1 (D. Or. Oct. 9, 2007).

Could not, that is, until now. And the district court does not explain why. There is no discussion of the precedential weight that should have transformed the jury's willful counterfeiting findings into an all-but conclusive presumption in favor of attorneys' fees. Instead, the district court employed a legally incorrect definition of success and concluded that Brandy Melville mostly struck out. 1-ER-11-14.

The district court even deemed Brandy Melville's argument that a fee award is necessary to further compensation and deterrence inconsistent with claiming success. But there is nothing inconsistent between pointing out that a plaintiff has received what the law allows and yet still has not been made whole. The jury awarded 200 times the minimum statutory damages for one counterfeited mark and 300 times

the minimum for the other. 1-ER-19-20; *see* 15 U.S.C. § 1117(c). The jury also awarded full disgorgement of all Redbubble's profits. 2-ER-125. What more must a plaintiff win to be considered a success? The reason compensation and deterrence are considerations in fee awards is because courts realize that sometimes damages fall short of achieving those goals.

Beyond willfulness, success, compensation, and deterrence, Redbubble also took objectively unreasonable legal stances in contesting liability on the LA Lightning Mark and the unregistered trademarks. Its argument that the counterfeiting was permitted as an "aesthetically functional" use both inverted the burden of proof on this purported defense and was legally indefensible. 1-ER-14; *see Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062, 1072-74 (9th Cir. 2006) ("The doctrine of aesthetic functionality does not provide a defense against actions to enforce the trademarks against such poaching."). Redbubble's fair use argument was frivolous against charges of counterfeiting and confusion. 1-ER-14; *see Smith v. Chanel, Inc.*, 402 F.2d 562, 564-65 (9th Cir. 1968) (permitting use only when it is "without deception as to origin"). Redbubble even attempted to invert the burden

of proof on the failure-to-mitigate-damages defense. 1-ER-14; *see* Ninth Circuit Model Civil Jury Instruction No. 5.3.

If some of Redbubble's legal positions could be considered reasonable, its kitchen-sink approach of also asserting frivolous arguments and contesting the incontestable significantly increased the cost of this litigation. Brandy Melville should not bear the expense that Redbubble could have eliminated had it taken reasonable positions.

Courts routinely award fees under the Lanham Act (and the analogous fee-shifting provision in the Copyright Act) where, as here, the defendant continued to violate the plaintiff's rights after receiving a cease-and-desist letter or takedown notice.[3] "Where, as here, the

---

[3] *E.g.*, *Am. Auto. Ass'n, Inc. v. Best Value Inn Oasis of Eden*, No. 12-cv-1303, 2012 WL 13012711, at *2 (C.D. Cal. July 10, 2012) (ignoring cease-and-desist letters); *Gucci Am., Inc. v. Guerrero*, No. 07-cv-7898, 2008 WL 11336190, at *8 (C.D. Cal. Nov. 4, 2008) (same); *see also Curves Int'l, Inc. v. Nash*, No. 11-cv-425, 2013 WL 3872832, at *4 (N.D.N.Y. July 25, 2013) ("Courts have held that the unauthorized use of proprietary marks can give rise to an exceptional case in which an award of attorneys' fees and costs is appropriate, ***especially where defendants have failed to comply with cease-and-desist letters***.") (emphasis added); *Choice Hotels Int'l, Inc. v. Kumar & Birla, LLC*, No. 11-cv-5100, 2013 WL 12097438, at *4 (E.D. Wash. Jan. 14, 2013) (finding case exceptional and awarding fees under Lanham Act where "Defendants certainly knew their acts amounted to infringement and were under notice through their

defendant is warned of its infringing activities and is given ample opportunity to cease and desist prior to the commencement of the lawsuit, attorneys' fees are clearly justified." *Kroll-O'Gara Co. v. First Defense Int'l, Inc.*, No. 99-cv-4899, 2000 WL 369721, at *1 (S.D.N.Y. Apr. 11, 2000).

This case should not have been a close call on fees. While there may be something to the district court's observation that Redbubble had its share of wins below, thereby suggesting some reasonableness in its positions, in the final analysis the jury found Redbubble to be the most egregious kind of trademark scofflaw: a willful counterfeiter. That verdict, like Brandy Melville's cease-and-desist letters, have not persuaded Redbubble to change its ways. It was an abuse of discretion

---

Franchise Agreement and the cease and desist letters"); *Big Bus Tours Ltd. v. Half Price Tour Tickets, LLC*, No. 12-cv-21579, 2012 WL 13014655, at *1 (S.D. Fla. Nov. 26, 2012) ("In the instant case, the undersigned finds that the Defendants ignored the 'cease and desist' letter sent by the Plaintiffs and continued their infringing behavior. For this reason, and based on other conduct by the Defendants set forth in the Complaint, the undersigned concludes that the Defendants' actions were willful and an award of attorneys fees under § 1117(a) was warranted."); *Arista Records, Inc. v. Beker Enters., Inc.*, 298 F. Supp. 2d 1310, 1313 (S.D. Fla. 2003) (awarding fees under Copyright Act where defendants ignored plaintiffs' cease-and-desist letters).

43

for the district court not to use every tool at its disposal to force Redbubble to stop stealing Brandy Melville's intellectual property. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011) ("It would be inequitable to force plaintiffs to bear the entire cost of enjoining defendants' willful deception when the injunction confers substantial benefits on the public."). Or at minimum to arm Brandy Melville to recover for those thefts each time they happen. Only a fee award would give Brandy Melville that chance. *See Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1276-77 (9th Cir. 1982) (reversing denial of attorney fees to plaintiff in willful trademark infringement case); *see also TrafficSchool.com,* 653 F.3d at 832 (reversing denial of attorneys' fees to plaintiff in willful trademark infringement case, holding "[i]t would be inequitable to force plaintiffs to bear the entire cost of enjoining defendants' willful deception when the injunction confers substantial benefits on the public"); *4SEMO.com Inc. v. S. Ill. Storm Shelters, Inc.*, 939 F.3d 905, 914 (7th Cir. 2019) (reversing denial of fee award to plaintiff in willful trademark infringement case).

## IV. The District Court Erred By Denying Prejudgment Interest.

### A. Standard Of Review

Whether prejudgment interest is available under a particular federal statute, like 15 U.S.C. § 1117(a), is a question of law subject to *de novo* review. *See, e.g., Wildman v. Burlington N. R.R. Co.*, 825 F.2d 1392, 1393 (9th Cir. 1987); *see also Gore, Inc. v. Glickman*, 137 F.3d 863, 865 (5th Cir. 1998).

### B. Analysis

It is elementary that "[m]oney today is not a full substitute for the same sum that should have been paid years ago." *In re Oil Spill by the Amoco Cadiz off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1331 (7th Cir. 1992) (*per curiam*). Thus, "a monetary award does not fully compensate for an injury unless it includes an interest component." *Kansas v. Colorado*, 533 U.S. 1, 10 (2001). For that reason, "[p]rejudgment interest . . . is an ordinary part of any award under federal law." *Amoco Cadiz*, 954 F.2d at 1331. An award of prejudgment interest "ensure[s] that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195

(1995); *see also W. Va. v. United States*, 479 U.S. 305, 310 (1987); *Miller v. Robertson*, 266 U.S. 243, 257-58 (1924).

For just this reason, this Court has held that interest should be made available in cases brought under the federal copyright laws:

> For the restitutionary purpose of [disgorgement] to be served fully, the defendant generally should be required to turn over to the plaintiff not only the profits made from the use of his property, but also the interest on these profits, which can well exceed the profits themselves. Indeed, one way to view this interest is as another form of indirect profit accruing from the infringement[.]

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1552 (9th Cir. 1989) (internal citations omitted).

Although this Court has not yet addressed the issue, other federal courts of appeals have held that prejudgment interest is available under Section 1117(a) of the Lanham Act. *See Utd. Phosporus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236-37 (10th Cir. 2000); *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436-37 (7th Cir. 1989); *but see Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 225 & n.24 (3d Cir. 2021); *cf. Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990) (award of prejudgment interest under § 1117(a) is "within the discretion of the trial court"). That provision

specifies that successful plaintiffs are entitled to recover, *inter alia,* "any damages sustained by the plaintiff," but does not specifically refer to prejudgment interest. 15 U.S.C. § 1117(a). Nonetheless, because a damages award without an interest component fails to make a plaintiff whole, it is appropriate to deem prejudgment interest a component of the "damages sustained" by the plaintiff. *See, e.g., Johnson v. Continental Airlines Corp.,* 964 F.2d 1059, 1062 (10th Cir. 1992) ("[P]rejudgment interest is an element of compensatory damages."); *see also W. Va.,* 479 U.S. at 310 ("Prejudgment interest is an element of complete compensation."); *id.* at 310 n.2 ("Prejudgment interest . . . achiev[es] full compensation for the injury those damages are intended to redress.").

The district court below rejected contrary appellate precedent as "unpersuasive," and held that prejudgment interest is categorically unavailable under 15 U.S.C. § 1117(a). 1-ER-14-15. That is so, the court declared, because "the Lanham Act specifically provides for an award of prejudgment interest under 15 U.S.C. § 1117(b)," but "Section 1117(a) is silent on the matter." *Id.* "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion.'" 1-ER-15 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also id.* ("Because Congress included language for prejudgment interest in subsection (a) and not (b), the Court presumes Congress acted intentionally.").

The district court thereby put more weight on the canon of *expressio unius est exclusio alterius* than it can bear. Courts do not apply that canon fetishistically, because the United States Code is not written with the precision of a Swiss watch, and it is not always appropriate to draw a negative inference from silence. To the contrary, the Supreme Court has cautioned that the *exclusio unius* canon "applies . . . only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.'" *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017) (citing *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002)).

Here, no such inference is sensible, given the background rule that prejudgment interest is presumptively available under federal law to fully compensate a plaintiff for a loss. *See, e.g.*, *W. Va.*, 479 U.S. at 310; *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983); *RK Co. v. See*, 622 F.3d 846, 853 (7th Cir. 2010); *Moore v. CapitalCare, Inc.*, 461

F.3d 1, 12 (D.C. Cir. 2006); *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 210 (4th Cir. 2000); *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1041-42 (10th Cir. 1990). In light of that background rule, and the textual command that a successful plaintiff is entitled to recover "*any* damages sustained," 15 U.S.C. § 1117(a) (emphasis added), Congress had no need to expressly authorize an award of prejudgment interest in that provision. To the contrary, courts "must presume that Congress intended to afford all ordinary remedies not expressly disclaimed when we interpret the ambiguous language it uses to create a cause of action." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 331 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011). "[T]he failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest." *Rodgers v. United States*, 332 U.S. 371, 373 (1947).

The reference to prejudgment interest in Section 1117(b) in no way suggests that Congress sought to preclude prejudgment interest in Section 1117(a). Section 1117(b) provides for the extraordinary remedy of treble damages, which is not a traditional remedy at common law. In

the absence of an express authorization of prejudgment interest in that subsection, the departure from traditional common-law remedies might have given rise to an inference that prejudgment interest was not available. Indeed, Section 1117(b) does not simply authorize an award of prejudgment interest in the treble-damages context, but specifies how such an award is to be calculated: "[T]he court may award prejudgment interest *on such amount* [*i.e.,* the trebled award] at an annual interest rate established under section 6621(a)(2) of title 26, beginning on the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment and ending on the date such entry is made, or for such shorter time as the court considers appropriate." 15 U.S.C. § 1117(b) (emphasis added). By selecting the modest federal rate provided in 26 U.S.C. § 6621(a)(2), Congress ensured that other, higher rates of interest would not unduly inflate an already trebled damages award.

By dealing with the mechanics of prejudgment interest in this specialized context, Congress did not in any way indicate an intent to preclude the normal operation of prejudgment interest under other provisions of law, including Section 1117(a). Judgments for damages under Section 1117(a), which provides for garden-variety damages well

50

known at common law, do not present such complications. Congress might therefore have very well thought it unnecessary to re-confirm what everyone already knows: prejudgment interest is a usual federal remedy. Because the statutory text provides no basis to conclude that Congress intended to preclude that remedy, the district court erred in holding that prejudgment interest is categorically unavailable under Section 1117(a).

## CONCLUSION

For the foregoing reasons, Brandy Melville respectfully requests the Court to reverse the district court's grant of judgment as a matter of law on the contributory counterfeiting claim involving the Heart mark. Brandy Melville also respectfully requests the Court to reverse the district court's denial of a permanent injunction, attorneys' fees, and prejudgment interest, or in the alternative, to vacate and remand for reconsideration of these matters under the correct legal standards.

Respectfully submitted this 28th day of March 2022.

> */s/ Keith J. Wesley*
> Keith J. Wesley
> Ellis George Cipollone O'Brien
> Annaguey LLP
> 2121 Avenue of the Stars, Ste. 2800
> Los Angeles, CA   90067
> *Counsel for Appellant/Cross-Appellee*

## STATEMENT OF RELATED CASES

### (Circuit Rule 28-2.6)

The undersigned attorney states the following:

[ X ]   I am unaware of any related cases currently pending in this court.

[ ]   I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

DATED this 28th day of March 2022.

*/s/Keith J. Wesley*
Keith J. Wesley
Ellis George Cipollone O'Brien
Annaguey LLP
2121 Avenue of the Stars, Ste. 2800
Los Angeles, CA 90067

*Counsel for Appellant/Cross-Appellee*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the attached corrected opening brief is proportionately spaced, has a typeface of at least 14 points, including headings and footnotes, and contains **9,772** words.

DATED this 28th day of March 2022.

*/s/ Keith J. Wesley*
Keith J. Wesley
Ellis George Cipollone O'Brien
Annaguey LLP
2121 Avenue of the Stars, Ste. 2800
Los Angeles, CA 90067

*Counsel for Appellant/Cross-Appellee*

# ADDENDUM OF PERTINENT STATUTES
## (NINTH CIRCUIT RULE 28-2.7)

15 U.S.C. § 1114................................................................55

15 U.S.C. § 1116................................................................60

15 U.S.C. § 1117................................................................67

15 U.S.C. § 1127................................................................70

**15 U.S.C.A. § 1114. Remedies; infringement; innocent infringement by printers and publishers**

(1) Any person who shall, without the consent of the registrant--

 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

 (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the United States and with the authorization and consent of the United States, and any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, and any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

(2) Notwithstanding any other provision of this chapter, the remedies given to the owner of a right infringed under this chapter or to a person bringing an action under section 1125(a) or (d) of this title shall be limited as follows:

 (A) Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

(B) Where the infringement or violation complained of is contained in or is part of paid advertising matter in a newspaper, magazine, or other similar periodical or in an electronic communication as defined in section 2510(12) of Title 18, the remedies of the owner of the right infringed or person bringing the action under section 1125(a) of this title as against the publisher or distributor of such newspaper, magazine, or other similar periodical or electronic communication shall be limited to an injunction against the presentation of such advertising matter in future issues of such newspapers, magazines, or other similar periodicals or in future transmissions of such electronic communications. The limitations of this subparagraph shall apply only to innocent infringers and innocent violators.

 (C) Injunctive relief shall not be available to the owner of the right infringed or person bringing the action under section 1125(a) of this title with respect to an issue of a newspaper, magazine, or other similar periodical or an electronic communication containing infringing matter or violating matter where restraining the dissemination of such infringing matter or violating matter in any particular issue of such periodical or in an electronic communication would delay the delivery of such issue or transmission of such electronic

communication after the regular time for such delivery or transmission, and such delay would be due to the method by which publication and distribution of such periodical or transmission of such electronic communication is customarily conducted in accordance with sound business practice, and not due to any method or device adopted to evade this section or to prevent or delay the issuance of an injunction or restraining order with respect to such infringing matter or violating matter.

 (D)(i)(I) A domain name registrar, a domain name registry, or other domain name registration authority that takes any action described under clause (ii) affecting a domain name shall not be liable for monetary relief or, except as provided in subclause (II), for injunctive relief, to any person for such action, regardless of whether the domain name is finally determined to infringe or dilute the mark.

 (II) A domain name registrar, domain name registry, or other domain name registration authority described in subclause (I) may be subject to injunctive relief only if such registrar, registry, or other registration authority has--

>  (aa) not expeditiously deposited with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name;

> (bb) transferred, suspended, or otherwise modified the domain name during the pendency of the action, except upon order of the court; or

> (cc) willfully failed to comply with any such court order.

 (ii) An action referred to under clause (i)(I) is any action of refusing to register, removing from registration, transferring,

temporarily disabling, or permanently canceling a domain name--

    (I) in compliance with a court order under section 1125(d) of this title; or

    (II) in the implementation of a reasonable policy by such registrar, registry, or authority prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of another's mark.

 (iii) A domain name registrar, a domain name registry, or other domain name registration authority shall not be liable for damages under this section for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name.

 (iv) If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant.

 (v) A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain

name or transfer of the domain name to the domain name registrant.

 (E) As used in this paragraph--

 (i) the term "violator" means a person who violates section 1125(a) of this title; and

 (ii) the term "violating matter" means matter that is the subject of a violation under section 1125(a) of this title.

 (3) (A) Any person who engages in the conduct described in paragraph (11) of section 110 of Title 17 and who complies with the requirements set forth in that paragraph is not liable on account of such conduct for a violation of any right under this chapter. This subparagraph does not preclude liability, nor shall it be construed to restrict the defenses or limitations on rights granted under this chapter, of a person for conduct not described in paragraph (11) of section 110 of Title 17, even if that person also engages in conduct described in paragraph (11) of section 110 of such title.

 (B) A manufacturer, licensee, or licensor of technology that enables the making of limited portions of audio or video content of a motion picture imperceptible as described in subparagraph (A) is not liable on account of such manufacture or license for a violation of any right under this chapter, if such manufacturer, licensee, or licensor ensures that the technology provides a clear and conspicuous notice at the beginning of each performance that the performance of the motion picture is altered from the performance intended by the director or copyright holder of the motion picture. The limitations on liability in subparagraph (A) and this subparagraph shall not apply to a manufacturer, licensee, or licensor of technology that fails to comply with this paragraph.

 (C) The requirement under subparagraph (B) to provide notice shall apply only with respect to technology manufactured after the end of the 180-day period beginning on April 27, 2005.

(D) Any failure by a manufacturer, licensee, or licensor of technology to qualify for the exemption under subparagraphs (A) and (B) shall not be construed to create an inference that any such party that engages in conduct described in paragraph (11) of section 110 of Title 17 is liable for trademark infringement by reason of such conduct.

## 15 U.S.C.A. § 1116. Injunctive relief

(a) Jurisdiction; service

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title. A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found, and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which

such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found.

(b) Transfer of certified copies of court papers

The said courts shall have jurisdiction to enforce said injunction, as provided in this chapter, as fully as if the injunction had been granted by the district court in which it is sought to be enforced. The clerk of the court or judge granting the injunction shall, when required to do so by the court before which application to enforce said injunction is made, transfer without delay to said court a certified copy of all papers on file in his office upon which said injunction was granted.

(c) Notice to Director

It shall be the duty of the clerks of such courts within one month after the filing of any action, suit, or proceeding involving a mark registered under the provisions of this chapter to give notice thereof in writing to the Director setting forth in order so far as known the names and addresses of the litigants and the designating number or numbers of the registration or registrations upon which the action, suit, or proceeding has been brought, and in the event any other registration be subsequently included in the action, suit, or proceeding by amendment, answer, or other pleading, the clerk shall give like notice thereof to the Director, and within one month after the judgment is entered or an appeal is taken the clerk of the court shall give notice thereof to the Director, and it shall be the duty of the Director on receipt of such notice forthwith to endorse the same upon the file wrapper of the said registration or registrations and to incorporate the same as a part of the contents of said file wrapper.

(d) Civil actions arising out of use of counterfeit marks

(1)(A) In the case of a civil action arising under section 1114(1)(a) of this title or section 220506 of Title 36 with respect to a violation that consists

of using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, the court may, upon ex parte application, grant an order under subsection (a) of this section pursuant to this subsection providing for the seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation.

(B) As used in this subsection the term "counterfeit mark" means--

> (i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or

> (ii) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 220506 of Title 36;

but such term does not include any mark or designation used on or in connection with goods or services of which the manufacture1 or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

(2) The court shall not receive an application under this subsection unless the applicant has given such notice of the application as is reasonable under the circumstances to the United States attorney for the judicial district in which such order is sought. Such attorney may participate in the proceedings arising under such application if such proceedings may affect evidence of an offense against the United States. The court may deny such application if the court determines that the public interest in a potential prosecution so requires.

(3) The application for an order under this subsection shall--

(A) be based on an affidavit or the verified complaint establishing facts sufficient to support the findings of fact and conclusions of law required for such order; and

(B) contain the additional information required by paragraph (5) of this subsection to be set forth in such order.

(4) The court shall not grant such an application unless--

(A) the person obtaining an order under this subsection provides the security determined adequate by the court for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure or wrongful attempted seizure under this subsection; and

(B) the court finds that it clearly appears from specific facts that--

(i) an order other than an ex parte seizure order is not adequate to achieve the purposes of section 1114 of this title;

(ii) the applicant has not publicized the requested seizure;

(iii) the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;

(iv) an immediate and irreparable injury will occur if such seizure is not ordered;

(v) the matter to be seized will be located at the place identified in the application;

(vi) the harm to the applicant of denying the

application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and

(vii) the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.

(5) An order under this subsection shall set forth--

(A) the findings of fact and conclusions of law required for the order;

(B) a particular description of the matter to be seized, and a description of each place at which such matter is to be seized;

(C) the time period, which shall end not later than seven days after the date on which such order is issued, during which the seizure is to be made;

(D) the amount of security required to be provided under this subsection; and

(E) a date for the hearing required under paragraph (10) of this subsection.

(6) The court shall take appropriate action to protect the person against whom an order under this subsection is directed from publicity, by or at the behest of the plaintiff, about such order and any seizure under such order.

(7) Any materials seized under this subsection shall be taken into the custody of the court. For seizures made under this section, the court shall enter an appropriate protective order with respect to discovery and use of any records or information that has been seized. The protective order shall provide for appropriate procedures to ensure that confidential,

private, proprietary, or privileged information contained in such records is not improperly disclosed or used.

(8) An order under this subsection, together with the supporting documents, shall be sealed until the person against whom the order is directed has an opportunity to contest such order, except that any person against whom such order is issued shall have access to such order and supporting documents after the seizure has been carried out.

(9) The court shall order that service of a copy of the order under this subsection shall be made by a Federal law enforcement officer (such as a United States marshal or an officer or agent of the United States Customs Service, Secret Service, Federal Bureau of Investigation, or Post Office) or may be made by a State or local law enforcement officer, who, upon making service, shall carry out the seizure under the order. The court shall issue orders, when appropriate, to protect the defendant from undue damage from the disclosure of trade secrets or other confidential information during the course of the seizure, including, when appropriate, orders restricting the access of the applicant (or any agent or employee of the applicant) to such secrets or information.

(10)(A) The court shall hold a hearing, unless waived by all the parties, on the date set by the court in the order of seizure. That date shall be not sooner than ten days after the order is issued and not later than fifteen days after the order is issued, unless the applicant for the order shows good cause for another date or unless the party against whom such order is directed consents to another date for such hearing. At such hearing the party obtaining the order shall have the burden to prove that the facts supporting findings of fact and conclusions of law necessary to support such order are still in effect. If that party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

 (B) In connection with a hearing under this paragraph, the court may make such orders modifying the time limits for discovery under the Rules

of Civil Procedure as may be necessary to prevent the frustration of the purposes of such hearing.

(11) A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to recover such relief as may be appropriate, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith, and, unless the court finds extenuating circumstances, to recover a reasonable attorney's fee. The court in its discretion may award prejudgment interest on relief recovered under this paragraph, at an annual interest rate established under section 6621(a)(2) of Title 26, commencing on the date of service of the claimant's pleading setting forth the claim under this paragraph and ending on the date such recovery is granted, or for such shorter time as the court deems appropriate.

## 15 U.S.C.A. § 1117. Recovery for violation of rights

(a) Profits; damages and costs; attorney fees

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances

of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

(b) Treble damages for use of counterfeit mark

In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title or section 220506 of Title 36, in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of--

(1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services; or

(2) providing goods or services necessary to the commission of a violation specified in paragraph (1), with the intent that the recipient of the goods or services would put the goods or services to use in committing the violation.

In such a case, the court may award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of Title 26, beginning on the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment and ending on the date such entry is made, or for such shorter time as the court considers appropriate.

(c) Statutory damages for use of counterfeit marks

In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

 (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

(d) Statutory damages for violation of section 1125(d)(1)

In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

(e) Rebuttable presumption of willful violation

 In the case of a violation referred to in this section, it shall be a rebuttable presumption that the violation is willful for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection

with the violation. Nothing in this subsection limits what may be considered a willful violation under this section.

## 15 U.S.C.A. § 1127 - Construction and definitions; intent of chapter

In the construction of this chapter, unless the contrary is plainly apparent from the context—

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

The term "principal register" refers to the register provided for by sections 1051 to 1072 of this title, and the term "supplemental register" refers to the register provided for by sections 1091 to 1096 of this title.

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this chapter includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes the United States, any agency or instrumentality thereof, or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

The terms "trade name" and "commercial name" mean any name used by a person to identify his or her business or vocation.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof--

    (1) used by a person, or

    (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term "service mark" means any word, name, symbol, or device, or any combination thereof--

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof--

(1) used by a person other than its owner, or

(2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

The term "collective mark" means a trademark or service mark--

(1) used by the members of a cooperative, an association, or other collective group or organization, or

(2) which such cooperative, association, or other collective group or organization has a bona fide intention to use in

commerce and applies to register on the principal register
established by this chapter,

and includes marks indicating membership in a union, an association,
or other organization.

The term "mark" includes any trademark, service mark, collective mark,
or certification mark.

The term "use in commerce" means the bona fide use of a mark in the
ordinary course of trade, and not made merely to reserve a right in a
mark. For purposes of this chapter, a mark shall be deemed to be in use
in commerce--

> (1) on goods when--

>> (A) it is placed in any manner on the goods or their
>> containers or the displays associated therewith or
>> on the tags or labels affixed thereto, or if the
>> nature of the goods makes such placement
>> impracticable, then on documents associated with
>> the goods or their sale, and

>> (B) the goods are sold or transported in commerce,
>> and

> (2) on services when it is used or displayed in the sale or
> advertising of services and the services are rendered in
> commerce, or the services are rendered in more than one State
> or in the United States and a foreign country and the person
> rendering the services is engaged in commerce in connection
> with the services.

A mark shall be deemed to be "abandoned" if either of the following
occurs:

> (1) When its use has been discontinued with intent not to

2017853

72

resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.

The term "registered mark" means a mark registered in the United States Patent and Trademark Office under this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, or the Act of March 19, 1920. The phrase "marks registered in the Patent and Trademark Office" means registered marks.

The term "Act of March 3, 1881", "Act of February 20, 1905", or "Act of March 19, 1920", means the respective Act as amended.

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

The term "Internet" has the meaning given that term in section 230(f)(1) of Title 47.

Words used in the singular include the plural and vice versa.

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is a member of the bar of this Court in good standing, and that the foregoing **Appellant's Opening Brief** was delivered via electronic service on this date to:

Kenneth B. Wilson, Esq.
Coastside Legal
455 1st Avenue
Half Moon Bay, CA   94019
Direct: 650-440-4211
Email: ken@coastsidelegal.com

*Counsel for Defendant-Appellee*

I declare under the penalties of perjury that the foregoing is true and correct, and that this certificate was executed in Los Angeles, California, this 28th day of March 2022.


/s/ Keith J. Wesley
Keith J. Wesley
Ellis George Cipollone O'Brien
Annaguey LLP
2121 Avenue of the Stars, Ste. 2800
Los Angeles, CA 90067

*Counsel for Appellant/Cross-Appellee*